UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        v.                     )    No. S1-4:10CR538 ERW
                               )                    (FRB)
LAMARVIN T. DARDEN,            )
                               )
                Defendant.     )

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

   1.   Defendant's Motion to Dismiss for Failure to Present Exculpatory Evidence (Docket No. 38),

        and

   2.   Defendant's Post-Hearing Motion to Dismiss Indictment (Docket No. 57)

Testimony and evidence was adduced on the defendant's motions at a hearing before the undersigned.  A written transcript of the proceeding was prepared and filed with the Court.  (See Docket No. 55.)  Following the hearing, the defendant was granted leave to file a post hearing supplemental motion and memorandum. The government has responded to the defendant's motions.  The following findings of fact are made based on the testimony and evidence adduced at the hearing and on the certified transcript of

proceedings occurring before the grand jury on October 21, 2010, a copy of which was separately submitted by each party.  (See Deft.'s Mot. Hrg. Exh. A; Govt.'s Exhs. 6B-1 and 6B-2 attached to Govt.'s Resp. to Deft.'s Suppl. Mot. to Dismiss Ind. (Docket No. 59).)  The government also submitted a compact disc containing an audio recording of the grand jury proceedings.  (See Govt.'s Exh. 5, attached to Govt.'s Resp. to Deft.'s Suppl. Mot. to Dismiss Ind. (Docket No. 59).)

<u>Findings of Fact</u>

On October 14, 2010, officers of the St. Louis, Missouri Metropolitan Police Department executed a search warrant at 2018 East Alice Avenue, in St. Louis, Missouri.  The warrant authorized the officers to search for drugs, drug paraphernalia, firearms, ammunition, United States currency, and documentation of residency at that location.  The subject of the police investigation was an individual named Lamarvin Darden.  Driver's license records, police records and probation/parole records listed 2018 East Alice Avenue as Darden's home address.  One of the officers participating in the investigation and execution of the search warrant was Detective Anthony Boettigheimer.

Detective Boettigheimer testified at the motion hearing that during the execution of the search warrant he encountered two elderly persons inside the residence.  He identified these persons as Freddie and Birdie Houston.  It appears undisputed that Freddie and Birdie Houston are the grandparents of Lamarvin Darden and that

-2-

they resided at 2018 East Alice Avenue.  Detective Boettigheimer testified that during the execution of the search warrant he spoke with both Freddie and Birdie Houston.  Detective Boettigheimer testified that he told the Houstons that the officers possessed a warrant to search the residence and that the officers had reason to believe that Lamarvin Darden was in possession of firearms and/or narcotics.  According to Detective Boettigheimer, he asked the Houstons whether they had ever seen Darden in possession of a 9 mm or a 45 caliber handgun and/or narcotics.  Detective Boettigheimer testified that Birdie Houston replied that shortly before the officers entered the residence, Darden had come into a bedroom where she was seated, removed a bullet proof vest which he was wearing and placed it on the bed.  She also said that Darden removed an object from his waistband and put it underneath the mattress on the bed.  Detective Boettigheimer testified that Freddie Houston told him that he, Freddie, possessed a 9 mm pistol, which was located in a middle dresser drawer in a bedroom, and that there were other guns in the room also which belonged to him.

        In the search of the residence, the officers found and seized a bullet proof vest located on a bed.  They also found and seized a loaded 9 mm handgun from under a mattress on the same bed.  Drug paraphernalia was also found in the residence, as were documents addressed to Lamarvin Darden at that residence.  Detective Boettigheimer testified that after the 9 mm handgun was found, he showed it to Freddie Houston, who then commented that he

-3-

couldn't believe Marvin took it; that he hadn't seen it for three weeks; and that the police were doing the family a favor because Lamarvin was going to be killed running the streets.

Evidence was also introduced at the hearing that Lamarvin Darden, during the booking process following his arrest on October 14, 2010, asked to make a telephone call to a girlfriend, which he was permitted to make.  As Darden spoke on the phone, a police officer overheard Darden to say words to the effect:  "Please get over to my grandfather's house and have him take ownership of this gun because I can't take another gun case because of my record."

Tom Hinton testified at the motion hearing that he is an investigator for the Office of the Federal Public Defender in the Eastern District of Missouri.  In the course of his duties in that capacity, he interviewed Birdie and Freddie Houston.[1]  Mr. Hinton testified that Birdie Houston told him that the bullet proof vest found and seized by the officers on October 14, 2010, was an item that had been brought to the residence by a friend of her niece several years prior to that date and that the vest had since been kept in a closet in the home.  Mr. Hinton testified that Birdie Houston told him that the vest was not on a bed when the police

---

[1]At the time of the hearing, the defendant was represented by an attorney from the Office of the Federal Public Defender. That attorney and that office have since asked, and were granted, leave to withdraw from their representation of the defendant due to a conflict of interest resulting from their representation of another client.  The defendant is now represented by different appointed counsel.

-4-

came to the home on October 14, 2010, and that she did not tell the police that the vest was on the bed.  Mr. Hinton testified that he also interviewed Freddie Houston.  Mr. Hinton testified that Freddie Houston told him that he, Freddie Houston, had a 9 mm pistol which he kept in a dresser drawer and that is where the gun was when the police found and seized it.  Freddie Houston told Mr. Hinton that he did not make any of the statements attributed to him by Detective Boettigheimer.

Mr. Hinton testified that the Houstons told him that they had not been threatened or intimidated by Lamarvin Darden or any third party on his behalf, nor had they been asked to change anything they had to say about any of these matters.

Mr. Hinton testified that the Houstons told him that they had been subpoenaed to testify before the grand jury and that they appeared pursuant to the subpoenas but did not testify before the grand jury.  Mr. Hinton testified that the Houstons told him that when they appeared to testify, they were interviewed by a law enforcement officer and by "the U.S. Attorney."  Mr. Hinton testified that the Houstons told him that they told the officer and U.S. Attorney the same things that they told Mr. Hinton about the events of October 14, 2010, and thereafter, and that they told the officer and U.S. Attorney that the police were not being truthful about what had occurred on October 14, 2010.  Mr. Hinton testified that the Houstons told him that, after being interviewed by these two persons, they were told that they were not going to be needed

-5-

to testify before the grand jury, that they each could leave, and that they did so.

A review of the grand jury transcript of October 21, 2010, shows that Joseph Steiger, a St. Louis Metropolitan Police Department Detective, appeared and testified before the grand jury. Assistant United States Attorney Antoinette Decker also appeared before the grand jury. Detective Steiger was one of the officers who had participated in the investigation of Lamarvin Darden, and was present at 2018 East Alice Avenue and participated in the execution of the search warrant at the residence on October 14, 2010. Detective Steiger summarized the investigation relating to Lamarvin Darden and related the events of October 14, 2010, which underlie the indictment in this case. Detective Steiger's testimony included a recitation of the statements which Detective Boettigheimer reported that Birdie and Freddie Houston had made to him on October 14, 2010. He also testified to the conversation overheard by Officer Garcia as Lamarvin Darden used the telephone during the booking process on October 14, 2010.

During the grand jury proceeding, Detective Steiger noted that Birdie and Freddie Houston had been subpoenaed to appear before the grand jury and were at that time seated in the waiting area outside the grand jury room. Detective Steiger testified that he and Assistant United States Attorney Decker had met with the Houstons earlier that morning and had interviewed them. Detective Steiger noted that, following the interview, it was decided that

-6-

the Houstons would not be called to appear before the grand jury but that Detective Steiger would relate to the grand jury what the Houstons had said during the interview earlier that day.  Detective Steiger then testified that the Houstons had "kind of changed their story."  He testified that Birdie Houston told him that she didn't see the vest on her bed and that she didn't see Lamarvin Darden place anything under the mattress of the bed.  She also said that the vest had been brought to the house by another family member in a bag along with some other items.  Assistant United States Attorney Decker asked Detective Steiger if Birdie Houston was "pretty much recanting what she said (on October 14, 2010)" and Detective Steiger replied, "Yes."  Detective Steiger testified that in the interview earlier that day, Freddie Houston said the 9 mm handgun belonged to him, that he kept it in a middle dresser drawer in his bedroom, and that is where the police found, and from where they seized, the gun.

After Detective Steiger concluded his testimony, Assistant United States Attorney Decker asked if any of the grand jurors had any questions.  A grand juror asked of Detective Steiger if he had questioned the Houstons about whether they had been threatened by Lamarvin Darden or any of his friends or if they feared harm if they didn't change their story.  Detective Steiger testified that the Houstons were not questioned about whether they had been threatened and then stated, "I think they were more concerned with - if they don't come in here, then they probably

-7-

don't have anything to worry about because they are not going to have any part of being testimony against him.  But we can address that afterwards with them, too, ma'am."  The grand juror responded, "I think that's important to know, because elderly folks are very intimidated and sometimes ruled by their family members.  That's . . . ."  Assistant United States Attorney Decker then stated, "Absolutely.  You know, that's one of the reasons - well, I don't want to say anything before you vote."  Shortly thereafter a grand juror asked of Detective Steiger, "In your professional opinion, do you feel that the grandparents were possibly coerced?"  Detective Steiger replied, "My opinion is that they are trying to protect their grandson."  Numerous other questions about the case were asked by grand jurors and answered by Detective Steiger and by Assistant United States Attorney Decker.

<u>Discussion</u>

As grounds to dismiss the indictment, the defendant asserts that "[t]he Assistant U.S. Attorney 1) failed to present exculpatory evidence to the grand jury, 2) misrepresented the evidence known to her to those jurors, and 3) personally commented on the credibility of witnesses."  (Deft.'s Post-Hrg. Memo. & Suppl. Mot. to Dismiss Ind., Docket No. 57, at p. 1.)  He further avers that the prosecutor engaged in misconduct

> in that the Assistant U.S. Attorney; [sic] 1)
> indicated to the grand jurors that the
> grandparents had "recanted" their statements –
> essentially endorsing the police version as

-8-

true; 2) allowed misinformation to be
presented, including giving the impression
that the grandparents had been called and
asked to change their story without evidence
to support that accusation and presenting an
inconsistent position that the defendant lived
at his grandparent's [sic] home when days
earlier she argued he did not reside there; 3)
gave her personal opinion as to the
credibility of the grandparents; and 4) gave
the impression that the grandparents may have
been scared of their own grandson.

(<u>Id.</u> at p. 4.)

The prosecution has no duty to present favorable or
exculpatory evidence to the grand jury. <u>United States v. Williams</u>,
504 U.S. 36 (1992). "[R]equiring the prosecutor to present
exculpatory evidence as well as inculpatory evidence would alter
the grand jury's historical role, transforming it from an
accusatory to an adjudicatory body." <u>Id.</u> at 51. "It is axiomatic
that the grand jury sits not to determine guilt or innocence, but
to assess whether there is adequate basis for bringing a criminal
charge. . . . That has always been so; and to make the assessment
it has always been thought sufficient to hear only the prosecutor's
side." <u>Id.</u> (internal citation omitted). Having no duty to do so,
the prosecutor here nevertheless chose to present to the grand jury
evidence that the Houstons had told a law enforcement official and
the prosecutor herself a different version of the events of October
14, 2010, and what had occurred on that day than the version
presented through the testimony of the police. The defendant
complains that the prosecutor told the grand jury that the Houstons

-9-

had "recanted," or changed, their previous statements, whereas the Houstons were claiming that they never in fact made the statements attributed to them. The argument is largely one of semantics. A review of the grand jury transcript shows that it was made clear to the grand jurors that the Houstons had stated and were contending that the police version of the events was not accurate.

The defendant asserts that the prosecutor engaged in misconduct in creating the impression that the Houstons had been asked to change their story. Evidence was presented to the grand jury that following his arrest on October 14, 2010, the defendant asked and was allowed to make a telephone call. Evidence was offered that Officer Garcia overheard the defendant tell the person with whom he was speaking on the telephone to go to his grandfather's house and tell the grandfather to claim possession of the handgun because Darden was facing a prison term if convicted of possessing a weapon. Evidence was also presented to the grand jury that, in their conversation with the prosecutor and the officer earlier in the day, Birdie Houston said that she had spoken with her grandson since he had been arrested and that Darden told her that none of that stuff was his. The prosecutor did not tell or say to the grand jury that the Houstons had been asked to change their story. Whether that was to be inferred was a matter for the grand jury. Indeed, in follow up questioning, a grand juror asked if the Houstons had been asked about whether anyone had threatened them in order to get them to change their story. Detective Steiger

-10-

replied, "No, we didn't talk at all about threats with them."  One of the grand jurors then offered an observation that "I think that's important to know, because elderly folks are very intimidated and sometimes ruled by their family members."  Later, a grand juror asked of Detective Steiger if, in his professional opinion, he felt the grandparents had been threatened.  He replied that, in his opinion, the grandparents were trying to protect their grandson.  Thus, there was no statement by the prosecutor or the testifying police officer that the Houstons were threatened to change their story.

The defendant also appears to claim that the prosecutor acted improperly by having Detective Steiger testify about the information told to him by the Houstons during their interview on the day of the grand jury proceeding rather than calling the Houstons to testify personally.  It is proper to offer hearsay testimony to the grand jury.  Costello v. United States, 350 U.S. 359 (1956); United States v. Bednar, 728 F.2d 1043, 1049 (8th Cir. 1984).  Moreover, the grand jurors were told that the Houstons were in the waiting room outside the grand jury room at the time of the grand jury proceedings.  If the grand jury wished to hear the testimony of the Houstons directly, they could have asked that the Houstons be called into the grand jury room to testify.  An indictment is valid "if the grand jury itself chooses to hear no more evidence than that which suffices to convince it an indictment is proper."  United States v. Williams, 504 U.S. at 53.

-11-

The defendant attributes further misconduct to the prosecutor, asserting, "The government also withheld the information that they had asserted, only days earlier at the detention hearing, that Mr. Darden did <u>not</u> reside at his grandparents [sic] home." (Deft.'s Post-Hrg. Memo. & Suppl. Mot. to Dismiss Ind., Docket No. 57, at p. 8.) (Emphasis by defendant.) The undersigned has listened to the digital audio recording of the detention hearing held in this cause before Magistrate Judge Mary Ann L. Medler on October 19, 2010. At no time during the hearing did the government make any statement as to the residence of the defendant, and did not claim at any time that the defendant did not reside at 2018 East Alice Avenue.[2]  The claim simply has no basis in fact.

"The proceedings of a grand jury are afforded a strong presumption of regularity, and a defendant faces a heavy burden to overcome that presumption when seeking dismissal of an indictment." <u>United States v. Exson</u>, 328 F.3d 456, 459 (8th Cir. 2003). "Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." <u>United States v. Wadlington</u>, 233 F.3d 1067, 1073 (8th Cir. 2000). "'[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of

---

[2]In an interview by the Pretrial Services Agency, Lamarvin Darden self-reported that he did not reside at 2018 East Alice. There is nothing in the record to show that the prosecution affirmatively adopted or accepted this claim by Darden.

the indictment is plainly inappropriate, even though the violation
may have been deliberate.'" Id. at 1074 (quoting United States v.
Morrison, 449 U.S. 361, 365 (1981)).  To establish such prejudice,
the defendant must show "'that the violation substantially
influenced the grand jury's decision to indict,' or . . . there is
'grave doubt' that the decision to indict was free from the
substantial influence of such violations." Bank of Nova Scotia v.
United States, 487 U.S. 250, 256 (1988) (quoting United States v.
Mechanik, 475 U.S. 66, 78 (1986)).

Review of the grand jury proceedings in their entirety
leads the undersigned to conclude that the prosecution engaged in
no impropriety or misconduct during the proceedings, nor was the
grand jury unduly influenced to return an indictment by any of the
alleged improper conduct by the prosecution.

## Conclusion

For all of the foregoing reasons, the defendant's motions
should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to
Dismiss for Failure to Present Exculpatory Evidence (Docket No. 38)
and Post-Hearing Motion to Dismiss Indictment (Docket No. 57) be
denied.

The parties are advised that any written objections to
this Memorandum, Report and Recommendation shall be filed not later

than **May 18, 2011.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE



Dated this _16th_ day of May, 2011.